[Civ. Nos. 15469, 15470, 15471. Second Dist., Div. Two. Feb. 20, 1947.]

E. J. STANTON AND SONS, Respondent, v. COUNTY OF LOS ANGELES et al., Appellants.

Harold W. Kennedy, County Counsel, Gordon Boller, Deputy County Counsel, Ray L. Chesebro, City Attorney, and Louis A. Babior, Deputy City Attorney, for Appellant.

Stanton & Stanton for Respondent.

MOORE, P. J.—The question involved is whether respondent as importer had so treated certain taxed lumber as to incorporate it into the mass of property in this state thereby removing it from the inhibition of the federal Constitution against a state's assessing duties on imports.

The three judgments appealed from resulted from three actions to recover taxes paid under protest on several lots of lumber in possession of respondent on the first Monday in March of 1939, of 1940, and of 1941, to H. L. Byram, the county tax collector of Los Angeles County who was on the date of each payment agent for the city of Los Angeles for the purpose of collecting taxes. Since the rates of assessments and the question of the city's obligation to pay the total amounts sued for are not pertinent to this decision further mention thereof will not appear. The justice of the taxes will appear from the record in the light of the authorities.

Respondent has been for 50 years engaged in the wholesale and retail lumber business in Los Angeles County. One of its activities has been the importation of hardwoods from Central and South American republics, Australia, the Philippines and other oriental lands. Its methods of handling the shipments of such lumber brought on the situation which induced the assessor to tax the lumber remaining in the stocks after being depleted by sales therefrom. As a shipment was unloaded by crane at the Inner Harbor Terminal Dock at Los Angeles Harbor the lumber was transported by Ross carrier to respondent's storage yard near the dock. There the pieces were segregated and stacked according to thickness, color, trade and type from the same mill. Lumber of different shipments was kept separate. After being so placed in the storage yard the lumber was tallied by counting the various stacks to ascertain the dimensions and "board measure of the different lumber." No change whatsoever was made in any piece in these stacks after receipt of it and prior to sale. From time to time sales were made from the stacks in the yard, prior to the tax dates, while at the same time no taxes were ever levied upon intact cargoes. Only the "broken lots" remaining after sales had been made from a cargo were taxed. Some of these remained on respondent's premises at the harbor, while others were transported to its yard at Vernon where it was "detailed to various bins" in which it was stored after

being tallied and sorted. By the method long in use by respondent each shipment is placed in a separate bin where it is segregated for color and thickness. All lumber is measured by board feet except lignum vitae which is measured by weight. It is stacked with laths between the layers of lumber to preserve it from fungus and rot and not to process it. It is not kiln-dried prior to sale. The taxed lumber, says respondent, consisted of "portions of shipments remaining after sales by plaintiff of portions of the original shipment . . . all lumber was kept in piles where only lumber from one shipper was present. . . . The bin depleted by sales is filled by the addition of more of the same type of lumber from the same importer. . . . Lumber is sold from these bins by a carload, a truckload or several carloads. The number of sales from any particular bin varies from a few to a single sale." Such was substantially the stipulation at the trial.

The controversy revolves about the question whether upon the sale of a portion of a shipment the remainder becomes subject to taxation. Respondent contends that so long as any parcel of the entire lot remains in the possession of the importer it is not subject to state taxation prior to sale; that each parcel or board is marked so as to distinguish it from all others and is therefore in itself an original package. Appellants argue that by the sorting, segregating and tallying of the timbers, and by virtue of sales from the cargoes received, the remainder being offered for sale becomes a part of the mass of property in the county and subject to taxation. As proof of the incorporation of the remnants of shipments into the mass of the county's property it was developed that it might be a number of years before a particular cargo is entirely sold out, and if a few odd pieces are left in a bin a new shipment of the same type from the same producer is put into the same bin.

The law governing the exemption of importations from local taxation had its genesis in section 10 of article I of the organic law of the United States*. The inhibition against a state's assessment of imports for taxation was the result of the long period of conflict among the newly liberated states in their

---

*Article I, section 10, clause 2: No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing it's inspection Laws, and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the United States; and all such Laws shall be subject to the Revision and Control of the Congress.

endeavor to maintain a union and at the same time to preserve the state in its pristine vigor. To achieve these ends under the new government section 10 was made a part of the Constitution forbidding a state to lay imposts or duties on imports. Because of the brevity of the inhibiting clause controversies readily developed with the result that the decision of *Brown* v. *Maryland* (1827), 12 Wheat. (U.S.) 419 [6 L. Ed. 678], first held that ''while remaining the property of the importer, in his warehouse, in the original form or package in which it was imported,'' an import is not taxable by the state. In that decision, which is a landmark in the development of nationalistic trends, some pronouncements were made that still must guide the courts in dealing with the fundamentals of taxation, namely: (1) A duty on imports is a tax on the article which is paid by the consumer; (2) the object of importation is sale which is the motive for paying the duties; (3) the tax by the state finds the article already incorporated with the mass of property by the act of the importer; (4) when by the act of the importer the import has become incorporated with the mass of property in the state it loses its distinctive character as an import and becomes subject to the taxing power of the state; (5) while the import remains the property of the importer, in his warehouse, in the original form or package in which it was imported, a tax upon it by the state is too plainly a duty on imports to escape the constitutional inhibition against taxing imports.

Subsequent decisions and text writers have followed the construction of *Brown* v. *Maryland* and have further clarified section 10 as well as the language of the Chief Justice. The meaning of his phrase ''original form or package'' is determinative of the instant contest. While respondent says each board is a separate package and is in its original form, appellants contend that the package of lumber is the bulk transported in the ship's hold. In this they are generously supported. The article in Corpus Juris Secundum (15 C.J.S. 310) declares that imports become subject to state regulation when the larger receptacle is broken for the purpose of selling and delivering the smaller units, and that they are no longer in the original package when they are sold; that an original package is an aggregation of goods put up in whatever form, covering or receptacle for transportation and as a unit transported. The import is subject to state taxation if the container is opened and smaller packages removed there-

from are offered for sale, or if the recipient of the package has an unexecuted intention to open it and sell its contents. (11 Am.Jur., p. 56, §§ 60, 62.) ▉ A large box containing bundles or parcels is the original package and when opened each parcel loses its character as an import, becomes a part of the general mass of property and is subject to local taxation. (*F. May & Co.* v. *New Orleans,* 178 U.S. 496 [20 S.Ct. 976, 44 L. Ed. 1165, 1170].)

▉ The legal concept of "original package" is an aggregation of articles imported. The purpose of wrapping the articles ordinarily found in a package is to unify them as a single import and to prevent their loss or destruction. When removed from the wrapper they cease to be imports and become a part of the property mass of the state. The term "original package" is generally applied to a bundle or box "packed with some commodity with a view to its safety and convenient handling in transportation. . . . It does not necessarily mean that goods shall be inclosed in a tight or sealed receptacle. . . . It relates wholly to goods as prepared for transportation, and has no necessary reference whatever to the package originally prepared or put up by the manufacturer." (*Cook* v. *Marshall County,* 119 Iowa 384 [93 N.W. 372, 104 Am.St.Rep. 283].) Indeed such articles of commerce as steel beams, threshing machines, telegraph poles and many others might be cited as illustrative of classes of imports that are incapable of being wrapped in cellophane or encased in wooden or steel crates. Although they might arrive at the dock without cover, nevertheless a shipment of such articles constitutes the original form or the original package. Such articles as those last mentioned, or lumber as in the instant case, require neither bundling to facilitate their handling nor wrappers to protect them from the elements. Indeed, to bundle timbers would impair the facility of handling a shipment. ▉ The phrase "original package" refers to the unit transported by the shipper and delivered in the exact condition in which it was shipped. (*McGregor* v. *Cone,* 104 Iowa 465 [73 N.W. 1041, 65 Am.St.Rep. 522, 39 L.R.A. 484].) As governed by interstate commerce rules, the original package retains its form and contents until received by the consignee in the same condition as when shipped, but ceases to be original when broken for sale of its smaller units. (*Re Agnew,* 89 Neb. 306 [131 N.W. 817, Ann.Cas. 1912C 676, 35 L.R.A.N.S. 836].) It is an aggregation of goods put up in

whatever form and as a unit transported from a foreign land to our shores, or from one state to another. (*Austin* v. *State,* 101 Tenn. 563 [48 S.W. 305, 70 Am.St.Rep. 703, 50 L.R.A. 478] ; 26 A.L.R. 971, 974.)

While no reported case involves the classification of a cargo of lumber, some light may be shed upon it by the adjudication as the original package of sealed cases of beer (*Leisy & Co.* v. *Hardin,* 135 U.S. 100 [10 S.Ct. 681, 34 L.Ed. 128]) ; casks containing a dozen bottles of tonic (*Purity Extract & Tonic Co.* v. *Lynch,* 226 U.S. 192 [33 S.Ct. 44, 57 L.Ed. 184]) ; crates containing 20 pails each of lard (*Armour & Co.* v. *North Dakota,* 240 U.S. 510 [36 S.Ct. 440, 60 L.Ed. 771]) ; packages containing two or more five gallon cans of gasoline (*Askren* v. *Continental Oil Co.,* 252 U.S. 444 [40 St.Ct. 355, 64 L.Ed. 654]) ; packages containing three or more barrels and crates enclosing bottles of liquor (*Guckenheimer* v. *Sellers,* 81 F. 997). An open box holding bottles of liquor is an original package in interstate commerce. (*Collins* v. *Hills,* 77 Iowa 181 [41 N.W. 571, 3 L.R.A. 110].) In an action to enjoin a newsdealer from selling a certain publication prohibited from sale it was held that when the newspapers were received by the defendant in bulk or in bundle and placed on the newsstand for sale they became commingled with the mass of property in the state. (*State ex rel. Black* v. *Delaye,* 193 Ala. 500 [68 So. 993, 995, L.R.A 1915E 640].) Even though a large receptacle is uncovered, leaving exposed the individual articles such as bales, cartons, crates and cases of dry goods which constitute the shipment, still such receptacle is the original package in contemplation of the constitutional restraint upon local taxation of an import. (11 Am.Jur., p. 55 § 60.) ■ The fact that one article in a cargo could be shipped alone does not for that reason render each item in such a shipment a separate, original package. (*In re Harmon,* 43 F. 372.)

From the authorities above quoted the conclusion is irresistible that the unit of importation is the original package; that such unit only and not its constituent elements is within the exclusive federal jurisdiction. Although a cargo in bulk may arrive at the port of entry in irons, or wrapped and tied with hemp ropes, or encircled with a silken thread or, as a herd of steers, have no binder at all, yet the entire shipment without regard to its exterior wrapper is the original package. ■ A cargo of planks, timbers or logs imported from foreign lands is surrounded by the invisible gossamer woven

of law, custom and convention which protects the merchandise from the local tax assessor only so long as it retains the unbroken wrapper in which it entered the port. But when such cargo sheds its invisible cover, even though in the warehouse of the importer, and is so sorted and classified as to facilitate its sale, and portions thereof are sold until the pile is depleted and the remnants thereof are commingled with new shipments of the same type of timbers, also to be offered for sale, then a reasonable construction of section 10 and the decisions which have interpreted its meaning compel the termination of immunity from local taxation of such broken lots and commingled remnants of imported lumber.

The circumstances attending the shipments in question are additional reasons for concluding that the several boards or timbers were not original packages. (1) Lumber is universally bought and sold by board feet; (2) the United States Customs' method of classification of lumber is by board feet; (3) the price paid by respondent for its shipments is determined by board feet except in the purchase of lignum vitae logs; (4) the consular certificates of origin describe the shipments by board feet, grade and variety; (5) the absence of an address from each board and the manner of transporting the lumber as an aggregation of goods—these facts establish the folly of calling each plank an original package, and of designating the segregated and classified lumber in the bins to be in the "original form" in which it was shipped.

Respondent says that each plank was an original package because it bore individual markings which made it distinguishable "as original packages of import." Such marks merely identified the producer, who varies them for different shipments. They are put upon the boards to enable the carrier to unload the shipment without mixing the cargoes going to different importers.

The conduct of respondent in the grading of the lumber, in piling and separating it with respect to thickness at the yards, in keeping the light from the dark, in classifying it as firsts, seconds, select number 1 and common, and in passing it through two or more sorting operations "making it readily available for sale" before storing it in the bins from which it is to be sold, argues that the lumber involved in these actions had been placed in the common mass of property in Los Angeles County prior to the assessment dates in each instance and that the collection of taxes thereon did not con-

stitute a violation of the constitutional restraint. This conclusion is emphasized by the further act of the importer in mixing the remnants of a bin remaining after sales therefrom with a new cargo of the same variety for the purpose of facilitating future sales.

Respondent endeavors to show a similarity of *Brown* v. *Maryland* to the case at bar. While there is no parallel, the Chief Justice, in disposing of Maryland's objection that the constitutional inhibition might be construed to cover sale piecemeal, announced that there is no restraint against local taxation on the import the moment such sale begins. If the importer "otherwise mixes them with the general property of the state by breaking up his packages, the tax finds the article already incorporated with the mass of property by the act of the importer. He has used the privilege he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them."

There is nothing said in the case of *F. May & Co.* v. *New Orleans,* 178 U.S. 496 [20 S.Ct. 976, 44 L.Ed. 1165], that supports the contention of respondent. May & Company imported merchandise from Europe. The importer made sales of packages of towels or of lace in the same parcels in which they were wrapped by the manufacturer, and contended that each of such parcels was an original package. The question for decision was whether the manufacturer's package or the box in which the packages were placed for shipment was the "original package." Both the Supreme Court of Louisiana and the United States Supreme Court held that the "original package" was that in which the goods were shipped to and received by the plaintiffs and not the smaller parcels put up by the manufacturer and packed in the box delivered to the carrier. The plaintiff argued that the importer might sell each separate package either from the box in which it was transported or from the shelves or counters in his store without being subjected to local taxation in respect of any package so brought into the country, provided such separate package be offered for sale in the form in which it was when placed in the box, case, or bale by the European manufacturer or packer. The court declared that such argument means that the power of the state to tax goods imported from other countries depends upon the particular form in which the foreign manufacturer or packer, of his own accord or by direction of the importer, has put them up in order to be sent to this

country; that if such contention were the law then each article of merchandise, such as a watch done up in a separate case, would be an ''original package'' and could not be regarded as a part of the property of the state subject to local taxation so long as it remained in that form and unsold in the hands of the importer. It was held that when the goods placed in the hands of agents for sale, in separate parcels, have been so acted upon by the importer they have ceased to be imports and have become part of the mass of the property of the state, liable to local taxation; that the ''original package'' was the box or case in which the goods imported were shipped, and when the box or case was opened for the sale or delivery of the separate parcels contained in it each parcel when removed from the box ''lost its distinctive character as an import and became property subject to taxation by the state as other like property situated within its limits.''

There is no material difference between the facts there adjudicated and those at bar. The principle involved in the two cases is identical. While the laces imported by May & Company were inclosed in cartons by the manufacturer, they were packed in wooden boxes for the ocean journey by the packer in the employ of the manufacturer. Likewise here, after the boards, planks and logs comprising the shipments to respondent had been sorted and arranged for sale, and especially after portions thereof had been sold and the remnants commingled in bins for further sales, they occupied the same status as the parcels of May & Company after being removed from the wooden boxes and offered for sale by the parcel. Certainly a mahogany timber containing ten board feet is as much an item of merchandise as a carton of lace, and as one of five thousand planks in a cargo it can not reasonably be termed an ''original package.''

The case of *Anglo-Chilean Nitrate Sales Corp.* v. *Alabama,* 288 U.S. 24 [53 S.Ct. 373, 77 L.Ed. 710], involved a shipment of 100-pound bags of nitrate. They were kept intact in a public warehouse in Mobile until removed by the ultimate consumers. It bears no resemblance to remnants of depleted cargoes of lumber sorted, classified and stored for sale, and is otherwise not authority for exempting respondent's depleted shipments from a local tax.

Neither does it appear that the cases of *Re Taxes, Pacific Guano & Fertilizer Co.,* 32 Hawaii 431; *Low* v. *Austin,* 13 Dall. (U.S.) 29 [20 L.Ed. 517], and *Southern Pacific Co.* v.

*City of Calexico,* 288 F. 634, shed any light upon the issue presented by the instant action. In each of those cases it is made clearly to appear that the imported merchandise was taxed after United States customs duties had been paid and while the merchandise lay in the warehouse of the importer, either in the same form in which it had been discharged by the carrier at the port or in the original packages in which it had been wrapped or crated by the shipper at the point of origin. In the Hawaii case the property taxed was phosphate rock in bulk, kept intact in bins in a warehouse separate from the general mass of property in the territory. In the Low case the wine was stored in a warehouse of the importers "in the original cases in which the wines were imported where they remained for sale." In the Southern Pacific case the cotton had been produced, ginned and baled in lower California. Each bale was marked or stenciled with the owner's initials and thus hauled into California and placed in the warehouse of the importer unchanged in any way until the first Monday in March, 1922, when it was assessed for taxation. The fact that the bales were further compressed "did not substantially change the form, aspect or content of the thing imported. True it is that the cover was temporarily removed; but . . . merely for the purpose of enabling the self same article, in no wise changed in character or extent, to be compressed into a smaller space that it might be shipped more economically."

In *Mexican Petroleum Corp.* v. *Louisiana Tax Commission,* 173 La. 604 [138 So. 117], it was merely held that the circumstance of pumping the oil into tanks of one thousand barrel capacity did not cause the liquid to lose its character as an import; that the only practical way of importing oil is in bulk; that in order to deliver the oil it may be pumped from the ship into the tanks on land, which process would not destroy its original bulk form of importation.

Respondent argues *in extenso* that the protection of an import from state taxation inheres in the article in its original package, citing *United States* v. *65 Casks,* 170 F. 449; *Austin* v. *Tennessee,* 179 U.S. 343 [21 S.Ct. 132, 45 L.Ed. 224]; *F. May & Co.* v. *New Orleans, supra; Champlain Realty Co.* v. *Brattleboro,* 260 U.S. 366 [43 S.Ct. 146, 67 L.Ed. 309], and *License Cases,* 5 How. (U.S.) 504 [12 L.Ed. 256, 258]; etc. There is no question as to the soundness of the proposition. The authorities cited by respondent base their holdings

upon the finding of what constituted the original package. In the 65 Casks case each cask contained 50 gallons, was marked to the consignee and if separated from the car could have been shipped alone without inconvenience. In the Austin case the cigarettes were put into pasteboard boxes, ten each. They were separately stamped and labeled. After purchase thereof the manufacturer piled upon the floor of its warehouse the number of packages sold and notified the express company to remove them. This was done by the latter company's placing the packages in one of its open baskets and transporting them to the place of business of Austin in Tennessee where the company's agent laid out the detached cigarette packages on Austin's counter. In the latter's defense it was contended that each "pack" of cigarettes was an original package as defined in *Brown* v. *Maryland*. The court in affirming the conviction for selling a "pack" in violation of a statute forbidding the sale of cigarettes said: "The real question in this case is whether the size of the package in which the importation is actually made is to govern, or the size of the package in which bona fide transactions are carried on between the manufacturer and the wholesale dealer residing in different states. We hold to the latter view. The whole theory of the exemption of the original package from the operation of state laws is based upon the idea that the property is imported in the ordinary form in which, from time immemorial, foreign goods have been brought into the country. These have gone at once into the hands of the wholesale dealers, who have been in the habit of breaking the packages and distributing their contents among the several retail dealers throughout the state. . . . No doubt the fact that cigarettes are actually imported in a certain package is strong evidence that they are original packages within the meaning of the law; but this presumption attaches only when the importation is made in the usual manner prevalent among honest dealers, and in a bona fide package of a particular size."

The Champlain case involved the question as to whether the logs of pulpwood floating down West River from a point in Vermont at the time of taxation were in transit to plaintiff's mill in New Hampshire and therefore throws no light upon the liability of respondent for local taxes on its remnants of shipments of lumber under section 10. The License Cases merely followed *Brown* v. *Maryland* in declaring an import is protected against local taxation while "in the hands of the

importer for sale, in the form and shape in which they were introduced.''

Respondent cites the decision of this court in *Dant & Russell* v. *Board of Supervisors* (128 P.2d 389) wherein we held in conformance with respondent's contention here that the shipment of thousands of pieces of lumber did not take from one piece its character of ''original package.'' A hearing was granted by the Supreme Court which affirmed the decision we had reversed. (21 Cal.2d 534 [133 P.2d 817].) While the affirmance was based upon the theory that the mahogany taxed was a shipment in interstate traffic (from the Philippines) and for that reason not liable to state taxation, the application for the hearing was based upon the county's claim that each board in the cargo was not an original package. The order of transfer having ''blacked out'' our opinion (*Estate of Kent*, 6 Cal.2d 154, 156 [57 P.2d 901]) it has no authoritative value or standing in this discussion. In our defunct decision we declared that the ''case of *Mexican Petroleum Corp.* v. *City of South Portland*, 121 Me. 128 [115 P. 900, 26 A.L.R. 965], . . . cited by respondent [the county] and . . . urged in the trial court . . . has been expressly disapproved as the law in this state. (See *Philippine Ref. Corp.* v. *Contra Costa County*, 24 Cal.App.2d 665, 669 [76 P.2d 163], . . .)'' The Maine court decision has been suggested by neither party to this action. It does not bear upon the issues. It was ''decided without reference to the commerce clause'' (ibid, p. 669) whereas respondent herein based its action on section 10, and the issue thereby created was controverted by appellants at all stages.

Respondent invokes the rule (*Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689]) that the appellate court is powerless to upset findings if there is any substantial evidence in the record to support them. Such rule applies only to findings upon contradictory evidence or where contrary inferences can be drawn from uncontradicted proof. Where there is no conflict the finding is no more than a conclusion of law. (*San Diego Trust & Savings Bank* v. *San Diego County*, 16 Cal.2d 142 [105 P.2d 94, 133 A.L.R. 416].) Findings herein were not essential to an intelligible decision. There was no witness except the assistant secretary and traffic manager of respondent. All exhibits came from respondent's files and their contents do not contradict the witness. The

judgments appealed from are in a situation analogous to if not identical with one based upon stipulated facts. Therefore the "findings" are not binding upon this court. Consequently, in our discussion of the issues we have proceeded from the testimony in the reporter's transcript and the documentary exhibits. So proceeding, we have derived conclusions contrary to those reached by the trial court.

It is therefore ordered that all three judgments be and they are reversed with directions to enter judgments in favor of appellants as prayed.

McComb, J., and Wilson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied April 17, 1947.